IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| **NEXT FINANCIAL GROUP, INC.** § | |
| § | |
| *Plaintiff,* § | |
| § | |
| VS. § | |
| § | |
| **THE OHIO NATIONAL LIFE** § | |
| **INSURANCE COMPANY;** § | **C.A. No. 4:18-cv-4652** |
| **THE OHIO NATIONAL LIFE** § | |
| **ASSURANCE CORPORATION;** § | |
| **OHIO NATIONAL EQUITIES,** § | |
| **INC. and OHIO NATIONAL** § | |
| **FINANCIAL SERVICES, INC.** § | |
| § | |
| *Defendants.* § | |

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
AND SUPPORTING MEMORANDUM**

TO THE HONORABLE UNITED STATED DISTRICT COURT:

Plaintiff NEXT Financial Group, Inc. ("NEXT") moves for partial summary judgment on its action for declaratory judgment and breach of contract against Defendants The Ohio National Life Insurance Company, Ohio National Life Assurance Corporation, and Ohio National Equities, Inc. (collectively "Ohio National") and would show:

**I.
SUMMARY**

Plaintiff NEXT requests that this Court construe an unambiguous Selling Agreement between NEXT and Ohio National, pursuant to which NEXT agreed to sell Ohio National's variable annuity contracts through NEXT's registered representative sales agents. Ohio National has breached the Selling Agreement by notifying NEXT of its refusal to pay trail compensation on outstanding annuity policies after December 12, 2018, and discontinuing payment of trail

commissions to NEXT on that date. The Selling Agreement plainly provides that such compensation will be paid to NEXT on individual variable annuities which remain in effect even if the Selling Agreement is terminated. The Court should grant partial summary judgment as a matter of law and declare that Ohio National is obligated to pay the trail commissions on each variable annuity contract issued to a client of NEXT until such contract is surrendered or annuitized.

## II.
## UNDISPUTED FACTS RELEVANT TO THIS MOTION

1. In 2001, Ohio National and Plaintiff NEXT entered into a Selling Agreement, pursuant to which NEXT *inter alia* agreed to sell Ohio National's variable annuity contracts through NEXT's registered representative sales agents, with commissions to be paid in an amount set forth on a Schedule of Commissions. True and correct copies of the relevant portions of the Selling Agreement and Schedule of Commissions ("Commission Schedule") are attached to the supporting Affidavit of Karen Eyster as Exhibits A and B.

2. For more than 15 years, NEXT's registered representatives have taken applications for, recommended, and sold hundreds of variable annuity contracts pursuant to the Selling Agreement.

3. The Selling Agreement provides that Ohio National will compensate Plaintiff NEXT and its representatives for their services rendered as follows:

9. COMMISSION PAYABLE

"Commissions payable in connection with the contract shall be paid to [NEXT], or its affiliated insurance agency, according to the Commission Schedule(s) relating to this Agreement as they may be amended from time to time and in effect at the time the contract payments are received by [Ohio National].
. . .

<u>The terms of compensation shall survive this Agreement</u> unless the Agreement is terminated for cause by [Ohio National] provided that [NEXT] remains a broker-dealer in good standing with the NASD and other state and federal regulatory agencies and that [NEXT] remains the broker-dealer of record for the account."

(Emphasis added). By its terms, the Selling Agreement cannot be amended except by writing signed by all parties. (Eyster Aff.; Exhibit "A").

4. The Commission Schedule attached to the Selling Agreement in addition to specifying the percentages and options for commission, includes the following sentence:

"Trail commissions will continue to be paid to the broker-dealer of record while the Selling Agreement remains in force <u>and will be paid on a particular contract until the contract is surrendered or annuitized</u>."

(Emphasis added) (Eyster Aff.; Exhibit "B).

5. Under the Selling Agreement and Commission Schedule, Ohio National agreed to pay NEXT and each NEXT representative who sold a contract a commission based on a percentage of the premium paid for the contract that was either (a) paid in full with the initial premium or (b) paid in part on payment of the initial premium with a smaller percentage payable each year for the life of the contract, which in the industry is referred to as a "trail." The Commission Schedule included the following payment options:

|  | Option 1 | Option 2 | Option 3 | Option 4 | Option 5 |
|---|---|---|---|---|---|
| Initial Premium | 6.00% | 5.00% | 1.00% | 7.00% | 3.00% |
| Add-on premiums | 6.00% | 5.00% | 1.00% | 7.00% | 3.00% |
| Trails Deposit Yrs 2-6 | 0.00% | 0.25% | 1.00% | 0.00% | 0.80% |
| Deposit Yrs 7+ | 1.00% | 1.00% | 1.00% | 0.00% | 0.80% |

A NEXT representative could elect to receive (a) a full commission of 7% at the time the initial premium was paid and no trail commission or (b) a lower initial commission of 1%, 3%, 5%, or 6% with a commensurate trail commission commencing the quarter after the first anniversary of

3

0%, 0.25%, 0.80%, or 1% through the sixth year of the contract and an additional trail commission of 1% or 0.80% commencing in the seventh year and continuing for the life of the contract.

6. Thus, through the Commission Schedule, Ohio National induced many representatives to opt for a smaller upfront commission, with the promise of greater compensation paid over the years. (Eyster Aff.).

7. As the broker of record for Ohio National annuity contracts, NEXT has performed its obligations under the Selling Agreement. Among other things, NEXT has assumed the responsibility for (a) training and supervising all its registered representatives in the offer and sale of variable annuity contracts, (b) supervising and reviewing its representatives' use of sales literature, advertising, and all other communications with the public, and (c) reviewing all sales for suitability and all applications for completeness and correctness as to form. In addition, NEXT expressly agreed that neither it nor its representatives would induce agents to leave Ohio National, engage in any course of conduct to systematically replace contracts issued by Ohio National, or recommend or cause the surrenders of cash values of the contracts in order to purchase or exchange for insurance or annuities issued by other companies unless such action was in the interest of the contract owners. NEXT further agreed that it would not do anything prejudicial to Ohio National's interest or the interests of its contract owners. (Eyster Aff., Ex. "A").

8. By letter dated September 21, 2018, Defendant Ohio National Financial Services, Inc. ("ONFS") gave written notice to NEXT and other broker dealers of the intent of Ohio National to terminate all selling agreements, including the Selling Agreement with NEXT, effective December 12, 2018, and further notified NEXT that "all individual annuity trail compensation will cease at that time" (hereinafter the "Termination Notice"), in contravention of its agreement to pay trail commissions on particular contracts until the contracts are surrendered or annuitized. A true

and correct copy of the Termination Notice is attached to the Affidavit of Karen Eyster as Exhibit E.

9.    NEXT sold more than 350 variable annuity contracts, issued by Ohio National, to its clients. Ohio National agreed to pay trail commissions on each contract until it was surrendered or annuitized by the client. As Ohio National has ceased paying trail commissions on these individual annuity contracts, a justiciable controversy exists requiring this Court's declaration of NEXT's rights and Ohio National's obligations under the Selling Agreement.

## II.
## THE ARGUMENT

### A.    *Standard of Review*

A Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014). Summary judgment is particularly appropriate when the question to be decided is an issue of law, in this case the interpretation of an unambiguous contract. *Constitution State Ins. v. Iso-Tech, Inc.,* 61 F.3d 405, 407 (5th Cir. 1995).

### B.    *Applicable Principals of Contract Construction Under Ohio Law*

The Selling Agreement has a choice of law provision:

"This agreement will be construed in accordance with the laws of the State of Ohio."

(Eyster Affidavit, Ex. A, Section 22). While Ohio National has not plead its choice of law, the governing Ohio law regarding contract construction is summarized below.

The cardinal principal for the judicial examination of any written instrument is to ascertain and give effect to the intent of the parties. *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.,* 678 N.E.2d 519, 526 (Ohio 1997). The Court examines the contract

*as a whole* and presumes that the intent of the parties is reflected in the language used in the agreement. *Martin Marietta Magnesia Specialties, LLC v. Pub. Utils. Comm'n of Ohio,* 129 Ohio St.3d 485, 2011-Ohio-4189, 954 N.E. 2d 104 at ¶ 22 (Ohio 2011).  When the language of a written contract is clear, a Court may look no further than the writing itself to find the intent of the parties. *Id.*  Courts should "attempt to harmonize all the provisions [of the contract] rather than produce conflict in them … [and] no provision of the contract should be ignored as inconsistent with another if there exists a reasonable interpretation which gives effect to both.  *Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co.,* 210 F.3d 672, 685 (6th Cir. 2000) (*quoting Ottery v. Bland,* 536 N.E.2d 651, 654 (Ohio Ct. App. 1987)).

Contracts that are, by their terms, clear and unambiguous are to be enforced as written by the parties.  *See Foster Wheeler*, 678 N.E.2d at 526.  *Alexander v. Buckeye Pipeline Co.,* 374 N.E.2d 146, 150 (Ohio 1978); *Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd.,* 525 F.3d 409 (6th Cir. 2008).  When interpreting a contract, the Court will presume that words are to be used for a specific purpose and will avoid interpretations that render portions meaningless or unnecessary.  *Wohl v. Swinney,* 118 Ohio St.3d 277, 2008-Ohio-2334, 888 N.E.2d 1062, at ¶ 22 (Ohio 2008).  Common words in a contract are presumed to hold their ordinary meaning unless a manifestly absurd result, or some other meaning, is clearly evidenced from the instrument.  *Waste Mgmt., Inc. v .Rice Danis Ind.,* 257 F.Supp.2d 1076, 1083 (S.D. Ohio 2003) (*citing Buckeye Pipeline Co.,* 374 N.E.2d at 150); *Shifrin v. Forest City Enters., Inc.,* 597 N.E.2d 499, 501 (Ohio 1992); *Crosier v. Ohio Dept. of Rehab. & Corr.,* No. 17AP-4, 2018 WL 1168385, at *5 (Ohio Ct. App. Mar. 6, 2018).

Conversely, when the Court cannot decipher the parties' intent through the plain language of the contract, a fact finder may consider extrinsic evidence to resolve the ambiguity and ascertain

6

the parties' intent.  *See Shifrin*, 597 N.E.2d 499 at 501.  Contract language is deemed ambiguous, however, only when its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations."  *Savedoff v. Access Grp., Inc.,* 524 F.3d 754, 763 (6th Cir. 2008) (*quoting Covington v. Lucia,* 151 Ohio App.3d 409, 2003-Ohio-346, 784 N.E.2d 186, at ¶ 18  (Ohio Ct. App. 2003)).  In deciding whether an ambiguity exists, the contract "must be construed as a whole" and the intent of the parties must be determined from the *entire* instrument and not from detached parts.  *Id.* (*quoting Tri-State Grp., Inc. v. Ohio Edison Co.,* 151 Ohio App.3d 1, 2002-Ohio-7297, 782 N.E.2d 1240, at ¶ 38 (Ohio Ct. App. 2002)).

If primary rules of contract construction – plain language of the document and then extrinsic evidence in that order – fail to clarify the meaning of a contract term, then a secondary rule of contract construction, requiring any ambiguous language in a standardized contract to be construed strictly against the drafter, comes into play.  *Cadle v. D'Amico,* 2016-Ohio-4747, 66 N.E.3d 1184, at ¶ 24 (Ohio Ct. App. 2016); *see also Farmers Nat'l Bank v. Delaware Ins. Co*., 94 N.E. 834, 839[JU1] (Ohio 1911).

C. *<u>Ohio National's Construction Renders the Survival Clause Meaningless, is Illogical and Leads to Absurd Results</u>*

In this case, the only reasonable interpretation, based upon the plain language of the Selling Agreement, is that Ohio National is obligated to continue to pay trail commissions on each outstanding variable annuity contract until the particular contract is surrendered or annuitized, notwithstanding Ohio National's termination of the Selling Agreement.  Why?  First, Section 9 of the Selling Agreement provides that commissions shall be paid to the broker-dealer, here NEXT, according to the commission schedule relating to the Selling Agreement and in effect at the time the contract payments are received by Ohio National.

Second, the Commission Schedules applicable to individual annuities provide that trail commissions will continue to be paid to the broker-dealer while the Selling Agreement remains in force <u>and will be paid on a particular contract until the contract is surrendered or annuitized</u> (emphasis added) (Eyster Aff.).

Third, Section 9 has a survival clause, specifically providing:

> "The terms of compensation <u>shall survive this Agreement</u> unless the Agreement is terminated for cause by [Ohio National] provided that [NEXT] remains a broker-dealer in good standing with the NASD and other state and federal regulatory agencies and that [NEXT] remains the broker or dealer of record for the account."

(Emphasis added). The survival clause thus expressly provides, without ambiguity, that compensation *shall* continue to be paid if NEXT remains as broker of record.

NEXT was not terminated for cause, as evidenced by Ohio National's notice dated September 21, 2018, and remains a broker-dealer in good standing with the Financial Industry Regulatory Authority, successor to the NASD, and other state and other federal regulatory agencies. (Eyster Aff.). Moreover, NEXT remains the broker-dealer of record for the account as evidenced by a second letter from ONFS dated September 21, 2018, attached as Ex. F to the Eyster Affidavit. In that letter, William Price, Senior Vice President and Assistant General Counsel of ONFS, writes:

> "As you know we recently notified you of a termination of your firm's Selling Agreement with ONL and Ohio National Equities, Inc. for the distribution of the contracts effective December 12, 2018. However, ONL will continue to maintain the designations of your firm and your representatives as broker of record and as representative of record, respectively, on its records and is willing to continue to provide you with access to On-Net … and provide you customer information through On-Net, customer service, written correspondence … to continue to service the contracts, in the case of each contract until the contract is canceled or your firm is no longer designated as broker of record for the contract." . . .

As NEXT was not terminated for cause and remains the broker of record on the variable annuity contracts, the survival clause expressly controls and trail commissions must be paid on a particular contract until the contract is surrendered or annuitized.

Notwithstanding that its construction conflicts with the plain language of the survival clause, Ohio National argues, by inference, that the provision in the Commission Schedule should be read to mean:

> "Trail commissions will continue to be paid to the broker-dealer of record **[only]** while the Selling Agreement remains in force and ~~will be paid~~ on a particular contract until the contract is surrendered or annuitized."

(emphasis added).

That reading violates established rules of contract construction in several ways. First, Ohio National's interpretation impermissibly conflicts with, and renders meaningless, the survival clause of Section 9 of the Selling Agreement. Parties may not trump express terms of the contract by drawing inferences or implying terms that contradict expressed terms. *Ohio Farmers Ins. Co. v. Wright,* 246 N.E.2d 552, 556 (Ohio 1969) ("any such possible inference is negated by the expressed language of the endorsement"); *Hamilton Ins. Servs. v. Nationwide Ins. Cos.,* 714 N.E.2d 898, 901, Ohio 1999) ("[t]here can be no implied covenants in a contract in relation to any matter specifically covered by the written terms of the contract itself.").

Second, Ohio National ignores the words "will be paid" in the second part of the sentence and interprets the conjunction "and" to create two conditions which must be satisfied. The use of another "will be paid" in the second part of the sentence logically connotes another circumstance in which payments will be made – one that survives termination in harmony with Section 9.

Third, it is illogical to leap to the conclusion that use of the word "and" necessarily conjoins two conditions which must be satisfied. The word "and" can just as easily join two occurrences

as it can to join necessary conditions. For instance, if someone says, "I am always happy when I'm riding a horse and reading a book,' the person can mean that either riding a horse or reading a book is sufficient to make them happy. They surely don't mean that they are always happy when reading a book while atop a horse. Ohio law makes clear that "and" can just as easily be read in disjunctive as the conjunctive "if the sense requires it." *Health Adm'rs of Am., Inc. v. Am. Med. Sec., Inc.,* 2001 Ohio at App. Lexis 1469 at n.18 (Ohio Ct. App. March 29, 2001). In short, the use of the conjunctive "and" is of no particular help in establishing a necessary condition.

Fourth, Ohio National's effort to draw an inverse inference by the use of the conjunctive "and" fails under what is known as the "fallacy of the inverse" or "denying the antecedent." Ohio National interprets the Commission Schedule to mean "if no selling agreement, no trail commission." The syllogism is the same argument as:

  Premise:  If a, then b.

  Inference:  Therefore, if no a, then no b

Courts expressly and universally reject negative inferences that are drawn from "denying the antecedent" and used to reject expressed terms when interpreting legal texts. *See NLRB v. Noel Canning,* 573 U.S. 513, 589 (2014) (explaining that the fallacy of the inverse involves "the incorrect assumption that if P implies Q then not - P implies not -Q"); *New Eng. Power Generators Ass'n v. FERC,* 707 F.3d 364, 370 (D.C. Cir. 2013); *United States v. Burtons,* 696 F. App'x 372, 378 (10th Cir. 2017). Not surprisingly, when interpreting legal text, Ohio law rejects the use of the same logical fallacy Ohio National tries here. As Ohio's Third District has explained:

> "The trial court … reasoned that since the Lemon law claim was invalid, the MMWA claims must also be invalid. The Court reasoned from *McGuire's* conclusion that if the Lemon law claim is valid, then the MMWA claim is valid, [and therefore, the trial court drew a] conclusion that if the Lemon law claim is not valid, then the MMWA claim is not valid. The Court's reasoning has the following syllogistic form: If A, then B. Not A, therefore not B. This syllogistic form is the

10

logical fallacy known as denying the antecedent; and therefore, the trial court's reasoning is erroneous."

*Iams v. Daimler Chrysler Corp.,* 174 Ohio App.3d 537, 2007-Ohio-6709, 883 N.E.2d 466, at ¶55 (Ohio Ct. App. 2007).

Finally, Ohio National's construction leads to absurd results, allowing Ohio National to benefit from NEXT representatives' apparently ill-fated decisions to earn a lower upfront commission for compensation in later years. By its own rationale, Ohio National could terminate the Selling Agreement at any time, without regard for the representatives' elections, after having represented that compensation terms would survive termination.

Ohio law does not allow the Court to adopt interpretations that can lead to absurd results for one of the parties. *Kuptz v. Youngstown City Sch. Dist.,* 175 Ohio app.3d 738, 2008-Ohio-1676, 889 N.E.2nd 166, at ¶23-24 (Ohio Ct. App. 2008). *Gatzaros v. Sault Ste. Marie Tribe of Chippewa Indians,* 575 F. App.'x 549, 553 (6th Cir. 2014) ("Plaintiffs' interpretation of paragraph 8 would lead to an absurd result. If Plaintiffs can unilaterally modify the Guarantee Agreement at any time they desire for any reason, then paragraph 10, requiring the consent of the parties in writing for any contract modification, would be read out of the contract"); *Pilkington N.A., Inc. v. Travelers Cas. & Sur. Co.,* 2009 U.S. Dist. Lexis 94322, at *16 (N.D. Ohio, Sept. 23, 2009) ("As between two constructions both equally susceptible of acceptance, … one will be adopted which gives operative effect to all the provisions of the contract, rather than one which leaves some provisions dormant and ineffectual").

In short, Ohio National's decision to cease paying trail commissions is in direct conflict with, and a repudiation of, its promise to NEXT and its representatives who chose a low upfront commission in exchange for compensation paid out over the life of a customer's contract, or at least until the customer annuitizes.

### D. *Ohio National Failed to Employ Language Which Was Expressly Conditional*

The Selling Agreement is a form contract drafted by Ohio National, which could have omitted the survival clause and written language expressly conditioning all payments, including trail compensation, upon the effectiveness of the Selling Agreement. Conditions precedent, as Ohio National now attempts to manufacture, are disfavored under Ohio law and must be created by the use of language which is expressly conditional. *Campbell v. George J. Igel & Co., Inc.*, 2013-Ohio-3584, 3 N.E.3d 219, at ¶ 13, 19 (Ohio Ct. App.—2013) (holding a lump sum payment provision was not explicit enough to indicate that the parties intended to create a condition precedent).

In the *Campbell* case, Campbell and George J. Igel & Company executed a construction site agreement permitting Igel to establish a staging area on Campbell's property for basing operations associated with a construction project. *Id.* at ¶ 4. Igel agreed to place an embankment on the property and replace top soil for drainage and to pay Campbell a lump sum payment of $50,000, in two installments, with $25,000 paid "at start" and $25,000 paid "upon completion and acceptance." *Id.* at ¶ 5. Campbell sued Igel for nonpayment. *Id.* at ¶ 7. Igel argued that Campbell's use of the property was a condition precedent to its obligation to pay while Campbell argued that nothing in the agreement made the payment obligation contingent upon actual use of the property. *Id.* The Ohio Court of Appeals wrote:

> "A condition precedent is an occurrence that must take place before a contractual obligation becomes effective. *Karr v. JLH of Athens, Inc.,* 4th Dist. No. 01-ca-16 2001 WL 688543, *13 (June 12, 2001). … the determination of whether a contractual provision is a condition precedent or merely a promise to perform is a question of the parties intent." Intent is best determined "by considering the language of a particular provision, the language of an entire agreement, or the subject matter of an agreement." *Atkins v. Bratcher,* 4th Dist. No. 07-ca-55, 2009-Ohio-42, 2009 WL 44822, para. 32, *quoting Hiatt v. Giles,* 2nd Dist. No. 1662, 2005

> Ohio, 6536, 2005 WL 3346172, para. 23. … "condition precedents are not favored by the law and whenever possible, Courts will avoid construing provisions to be such unless the intent of the agreement is plainly to the contrary."

*Id.* at ¶ 13.

The Court ruled that the lump sum payment provision set forth an unconditional promise to perform – a promise to make payment of $50,000. *Id.* at ¶ 19. The words "at start" and "upon completion" merely set forth a time that [Igel] was required to make payment. *Id.* The Court specifically stated:

> "Had the parties intended to make payment conditional upon Appellee's actual use of the Property, they could easily have inserted language to that effect. We find that the lump sum payment provision is not explicit enough to indicate that the parties intended to create a condition precedent."

*Id.*

Similarly, if Ohio National wanted to create two necessary conditions, either one of which would suffice to cease paying trail commissions, then it could have omitted the survival clause of Section 9 and drafted the Schedule of Commissions using legally recognized terms of condition such as "on the condition that," "provided that," or "so long as" the "Selling Agreement has not been terminated." Or, it could have used language such as:

> "Trail commissions will continue to be paid to the broker dealer of record on a particular contract until the **earlier** of the date the contract is surrendered or annuitized or the Selling Agreement is terminated."

It did not do so and it cannot now recast the contract provision[1] to negate the survival clause of Section 9, and render an absurd result for the parties who agreed to sell its annuities. Otherwise,

---

[1] In a related action, pending as *Veritas Independent Partners, LLC v. Ohio National Life Insurance Company, et al.,* Case No. 1:18-cv-769, in the United States District Court for the Southern District of Ohio, Ohio National argues that contract provision should be recast as follows:
> "Trail commissions will continue to be paid to broker dealer of record [a] while the Selling Agreement remains in force and [b] will be paid on a particular individual annuity until the contract is surrendered or annuitized."

There, Ohio National creates out of whole cloth, the [a] and [b] labels and inserts them into precise locations in the contract in an effort to lead the Court to misinterpret the provision.

13

the representatives who elected to take trail compensation, until their customers' contracts are surrendered or annuitized, are harmed by their election simply as a result of Ohio National's election to terminate its Selling Agreement at any time. The Survival Clause of Section 9 eliminates that harm, preventing the absurd results.

As a matter of law, the only reasonable construction of Section 9 and the Commission Schedule taken together is that trail commissions are to be paid on a customer's particular contract until the contract is surrendered or annuitized, notwithstanding termination of the Selling Agreement.

Ohio National drafted the Selling Agreement. While it is free to cease selling individual annuities and to terminate the Selling Agreement with NEXT, it must honor its promises and continue to pay NEXT and its representative's trail commissions on those individual annuities sold until they are surrendered or annuitized.

WHEREFORE, Plaintiff NEXT Financial Group, Inc. requests that the Court grant partial summary judgment on Counts 1 and 2 under the complaint (filed as an Original Petition in state court) and declare as a matter of law (i) that the terms of compensation under the Selling Agreement survive the termination of the Selling Agreement, (ii) that Ohio National has breached the Selling Agreement, (iii) that Ohio National is obligated to pay trail commissions on each individual variable annuity contract sold to a client of NEXT until the particular contract is surrendered or annuitized, and (iv) grant such other and further relief to which Plaintiff NEXT Financial may be justly entitled.

Respectfully submitted,

By: */s/ Andrew R. Harvin*
Andrew R. Harvin
State Bar No. 09187900
Fed ID No. 1849
aharvin@drhrlaw.com
The Lyric Centre
440 Louisiana Street, Suite 2300
Houston, Texas 77002
(713) 228-5100 (telephone)
(713) 228-6138 (facsimile)

***ATTORNEY IN CHARGE FOR PLAINTIFF
NEXT FINANCIAL GROUP, INC.***

**OF COUNSEL:**

Jordan T.J. Howes
State Bar No. 24107293
jhowes@drhrlaw.com
DOYLE, RESTREPO, HARVIN & ROBBINS, LLP
The Lyric Centre
440 Louisiana Street, Suite 2300
Houston, Texas 77002
(713) 228-5100 (telephone)
(713) 228-6138 (facsimile)

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 27, 2019, a copy of the foregoing document was electronically filed through the CM/ECF system, which will automatically serve a Notice of Electronic Filing on the following attorney:

Bill E. Davidoff
State Bar No. 00790565
Fed. ID No. 19513
bill.davidoff@figdav.com
FIGARI + DAVENPORT, LLP
901 Main St., Suite 3400
Dallas, Texas  75202

*Attorney in Charge for Defendants*

*/s/ Andrew R. Harvin*
Andrew R. Harvin